Mailed:  April 5, 2002
Hearing:                                    Paper No. 11
February 7, 2002                                     ejs

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re SPX Corporation
_____

Serial No. 75/877,999
_____

John H. Weber and Kenneth H. Oh of Pepper Hamilton, LLP for SPX Corporation.

Stacy B. Wahlberg, Trademark Examining Attorney, Law Office 113 (Meryl Hershkowitz, Acting Managing Attorney).
_____

Before Seeherman, Holtzman and Drost, Administrative Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:

SPX Corporation has appealed from the final refusal of the Trademark Examining Attorney to register E-AUTODIAGNOSTICS as a trademark for "electronic engine analysis system comprised of a hand-held computer and related computer software."[1]  Registration has been refused

---

[1]  Application Serial No. 75/877,999, filed December 22, 1999, based on an asserted a bona fide intention to use the mark in commerce.

pursuant to Section 2(e)(1) of the Trademark Act, 15 U.S.C. 1052(e)(1), on the ground that applicant's mark is merely descriptive of its identified goods. Registration has also been refused because applicant has failed to comply with the Examining Attorney's requirement for an acceptable identification of goods, and to comply with the Examining Attorney's requirement to supply information concerning its goods.

Applicant and the Examining Attorney filed briefs, and an oral hearing was held.[2]

We turn first to the requirement for an acceptable identification of goods.[3] Applicant has identified its goods as "electronic engine analysis system comprised of a hand-held computer and related computer software." The

---

[2] With its brief applicant submitted copies of third-party registrations for trademarks containing design forms of the letter "E." The Examining Attorney has objected to these submissions as untimely. We agree. Trademark Rule 2.142(d) provides, in relevant part, that the record in an application should be complete prior to the filing of an appeal. Accordingly, we have not considered the registrations. We have, however, considered dictionary definitions of "auto" which were submitted by applicant with its brief, since the Board may take judicial notice of dictionary definitions. See **University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., Inc.**, 213 USPQ 594 (TTAB 1982), aff'd, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983). Similarly, we have taken judicial notice of the dictionary definition of "E" submitted by the Examining Attorney with her appeal brief.

[3] After the oral hearing applicant filed a request for suspension and remand so that it might amend the identification of goods in an attempt to obviate this ground for refusal. There are various problems with this request, not least of which is the fact that it was not accompanied by the proposed amendment for the Examining Attorney to consider. However, because of our determination of the issue of the acceptability of the identification, the request for remand is denied as moot.

Examining Attorney states that this identification is indefinite because applicant has not indicated the function of the related computer software, as a result of which it is not clear whether the software is system operating software, operating software for the hand-held computer, some type of communication software for communications between the handheld computer and an electronic engine, or some other function. Although certainly an additional phrase in the identification stating the function of the software would provide more information as to exactly what the software does, we do not believe it to be necessary in order to provide the public with notice as to the nature of applicant's goods. As identified, the "computer software" would be understood to be used in connection with a hand-held computer used in an electronic engine analysis system, and this identification is adequate to indicate the scope of any registration which applicant might obtain. Accordingly, we reverse the requirement for a more definite identification of goods.

The next ground of refusal is that the mark is merely descriptive of the goods. We affirm the refusal on this ground.

A mark is merely descriptive if it immediately conveys knowledge of the ingredients, qualities, or characteristics

of the goods or services with which it is used.  **In re**

**Gyulay**, 820 F.2d 1216, 3 USPQ2d 1009 (Fed. Cir. 1987).  The

determination is made not in a vacuum, but in relation to

the goods on which, or the services in connection with

which, the mark is used or proposed to be used.  See **In re**

**Abcor Development Corporation**, 588 F.2d 811, 200 USPQ 215

(CCPA 1978); **In re Venture Lending Associates**, 226 USPQ 285

(TTAB 1985).  Further, the determination is made from the

standpoint of the average prospective purchaser.  **In re**

**Abcor Development Corporation**, supra.

In support of the refusal of registration, the

Examining Attorney has submitted dictionary definitions for

the various elements of applicant's mark, as follows:

> e-: (electronic)  The "e-dash" prefix
> may be attached to anything that has
> moved from paper to its electronic
> alternative, such as e-mail, e-cash,
> etc.[4]
> E: E stands for electronic.  But it's
> become the all-purpose Internet and Web
> prefix.  Stuck on the front of any term
> you want, it means to make that thing
> happen over the Internet/Web, e.g.,
> e-commerce, e-mail, e-check.[5]
>
> auto: an automobile[6]
> auto: *adjective* relating to cars[7]

---

[4]  The Computer Glossary, 8th ed. © 1998.
[5]  Newton's Telecom Dictionary, 16th ed. © 2000.
[6]  The American Heritage Dictionary of the English Language, 3d ed. © 1992.
[7]  Cambridge International Dictionary of English © 2000

4

> diagnostic:  the art or practice of
> diagnosis
> diagnosis: investigation or analysis of
> the cause or nature of a condition,
> situation, or problem (~ of engine
> trouble)[8]

The Examining Attorney has also made of record a large number of excerpts taken from the NEXIS data base from articles in which the phrases "auto diagnostic(s)" or "automobile diagnostic(s)" appear, including the following:[9]

> AAA New Mexico is a non-profit auto
> club providing roadside assistance,
> travel services, auto diagnostics,
> traffic safety programs, insurance and
> other services.
> "Albuquerque Journal," April 13, 1998
>
> About $5,700 in computer equipment was
> stolen during a break-in at Performance
> Auto, 5677 Niagara Falls Blvd., police
> said.
> Police said that an overhead garage
> door window was broken to enter the
> business and that a $3,500 laptop
> computer, a $700 auto diagnostic
> computer and other equipment were taken
> Tuesday.
> "The Buffalo News," November 9, 2000
>
> ...where he started working as a
> testing engineer for an auto parts
> maker.
> In 1974 Georgiu started All Test, a
> manufacturer of auto diagnostic
> computers.  He sold AllTest in 1986 for
> $5 million.  Using that money, he next
> started Alldata....
> "Sacramento Business Journal,"

---

[8]  Webster's Collegiate Dictionary, 10th ed. © 1993).
[9]  We have given no consideration to the two articles appearing in foreign publications, as there is no indication as to whether these articles had any public exposure in the United States.

October 20, 2000

Alldata, created in 1986, designs and manufactures computer software and CD-Rom discs that are used for auto diagnostics and repair.
Georgiu would not divulge current financial information....
"Sacramento Bee," February 10, 1996

The move allows InfoMove to use Alldata automobile diagnostic and maintenance information....
"Global Positioning & Navigation News," June 14, 2000

... They will still sell cars, but a certain profit share will come from providing remote auto diagnostics or traveler information.
"Journal of Commerce," May 10, 2000

But it also boasts computerized instruments.  And one recent day, it was a showcase for the latest in computerized auto diagnostic equipment displayed by Buffalo Grove-based Snap-on Industrial salesmen.
For the 20 or so automotive educators who came from as far as Lockport and Crystal Lake, it was a chance to check out the expensive, computerized automotive equipment....
"Chicago Tribune," November 18, 1998

A $2,500 hand-held automobile diagnostic scanner was stolen in the past week from Page Street Auto....
"Chicago Daily Herald," June 4, 1998

RIStech, Franklin, Wis., has developed Interactive Support (IS), a technology that provides remote support of PC-based controls for industrial equipment used in material handling, packaging, automobile diagnostics, and more.
"American Machinist," September 1, 2000

6

> Sharon Paige, a corrections department
> security officer, has been cleared of
> grand larceny charges in the theft of
> an automobile diagnostic computer worth
> up to $3,000.
> "USA Today," August 27, 1997

Applicant argues that when "auto" is used as a prefix in the term "autodiagnostics" it will not be viewed as "automobile diagnostics" but will be regarded as "an amorphous concept of a self-propelling diagnostics." Brief, p. 3. It is applicant's position that in its mark "auto" is used as a prefix, and not as an abbreviation for "automobile," and therefore when this prefix, meaning "self-moving" or "self-propelling," is combined with "diagnostics," the resulting "autodiagnostics indicates that the diagnostic is somehow 'self-moving' or 'self-propelling.'" Brief, p. 3.

We are not persuaded by this argument. As noted above, the question of mere descriptiveness must be determined not in the abstract but in relation to the goods for which registration is sought, and the impact that the mark is likely to have on the average purchaser of the goods. Applicant's identification of goods is for an electronic engine analysis system, and this identification encompasses systems for the analysis of automobile engines, a point which applicant does not dispute. When consumers

see the mark E-AUTODIAGNOSTICS in connection with an electronic automobile engine analysis system, they will immediately understand the term AUTO as referring to "automobile" rather than as a prefix indicating that the system or the diagnostics are "self-moving." In fact, the dictionary definition of "auto," submitted by applicant with its brief and which we judicially notice, does not state that "auto" means simply "self-moving." Rather, this definition includes a reference to automobiles, to wit:

> An abbrev. of automobile, used as a prefix with the meaning of self-moving, self-propelling; as, an autocar, an autocarriage, an autotruck, etc., an automobile car, carriage, truck, etc.[10]

Applicant has not submitted any example or evidence of "auto" being used as a prefix in a term that does not refer to an automobile from which we can conclude that purchasers of its electronic engine analysis system would regard the prefix "auto" as meaning self-moving in the context of the mark.

On the contrary, the articles which the Examining Attorney has made of record show that "auto diagnostics" is

---

[10] http://www.dictionary.com. The website indicates the definition is taken from Webster's Revised Unabridged Dictionary, © 1996, 1998.

8

a recognized term for goods and services involved in engine analysis, including computers which are used for this purpose.

Applicant also notes that there is no evidence of the use of E-AUTODIAGNOSTISTICS or AUTODIAGNOSTICS as a single term. Although conceding that the Examining Attorney has "submitted numerous articles as evidence of the descriptiveness of the words 'auto diagnostics' or 'automobile diagnostics,'" and that "'auto diagnostics may be perceived as 'automobile diagnostic'" brief, p. 4, applicant asserts that there is no evidence that "autodiagnostics" "would indicate anything more than an amorphous diagnostic propelling itself.

It is true that, although there are numerous articles in which the terms "auto diagnostics" or "automobile diagnostics" are used, there is no evidence of the use of "autodiagnostics" (or "e-autodiagnostics") as a single word. However, it is not necessary that a term appear in a dictionary or a newspaper article in the exact manner in which it is depicted as a trademark for that mark to be found merely descriptive. It has been held in numerous cases that telescoping two words which are merely descriptive of the goods into a single term by the deletion of a space does not avoid a finding of mere descriptiveness

9

for the combined term.  See, for example, **In re BankAmerica Corp.**, 229 USPQ 852 (TTAB 1986) (PERSONALINE is merely descriptive of consumer loan services in which a personal line of credit is provided); **In re U.S. Steel Corp.**, 225 USPQ 750 (TTAB 1985) (SUPEROPE merely descriptive of wire rope); **In re Gagliardi Bros., Ind.**, 218 USPQ 181 (TTAB 1983) (BEEFLAKES is merely descriptive of thinly sliced beef).

In this case, it would be readily apparent to the purchasers of the identified goods that the mark E-AUTODIAGNOSTICS consists of the prefix "E-" followed by the two ordinary words AUTO DIAGNOSTICS which have been telescoped together into AUTODIAGNOSTICS, particularly in view of the recognized meaning of "auto diagnostics" for such goods.

Nor does the addition of the prefix "E-" change the merely descriptive significance of the mark as a whole. The dictionary definitions submitted by the Examining Attorney show that this prefix indicates the electronic or internet nature of an item or service.  Applicant itself points to an article made of record by the Examining Attorney which states, in part, that:

> When you see a technological term that starts with the letter 'e' and a hyphen, it most likely is an

> e-commerce-driven term.  And nine times
> out of 10, the 'e' means electronic.[11]

Applicant asserts that the cases in which the Board has found E-prefix marks to be merely descriptive involve services, rather than goods.  Although this is true, it does not mean that when the E-prefix is part of a mark used for goods, that mark cannot be merely descriptive of the goods.

Given the definition of the E-prefix as indicating something electronic, as well as the evidence discussed above as to the descriptiveness of the term AUTODIAGNOSTICS for an engine analysis system, we find that, when the combined term E-AUTODIAGNOSTICS is used for an "electronic engine analysis system comprised of a hand-held computer and related computer software," purchasers, prospective purchasers and users of such goods will immediately

---

[11] "USA Today," July 8, 1998.  The entire portion quoted by applicant in its brief begins with the following sentences: "The words e-tail and e-tailer stem from the boom in electronic commerce and are a takeoff on the word retail.  They generally refer to retail and retailers in cyberspace, usually in the form of on-line malls and merchants."  Applicant argues that this article "supports the conclusion that neither the mark as a whole or viewed alone [presumably the E-prefix] is descriptive for goods."  Brief, p. 5.  However, the entire quote is in answer to the question, "What are e-tailers?"  The fact that the question is answered in terms of on-line malls and merchants is directly due to the nature of the question asked.  We think the further portion of the answer, about the nature of the prefix E- in general, is far more telling as to the understanding of this term by the public.

understand that applicant's goods are an electronic system used to analyze car engines. Accordingly, we find that the mark is merely descriptive of applicant's identified goods.

Finally, registration has been refused on the basis that applicant did not comply with the Examining Attorney's requirement to supply samples or advertisements or promotional materials or, if such materials were not available, to describe the nature, purpose and channels of trade or the goods, and to indicate whether the goods are used in connection with automobiles. The Examining Attorney made this requirement for information in the first Office action. Applicant, in responding to the first Office action, totally ignored the request. The requirement for information was made final in the next Office action. Applicant did not respond to this action, but filed a notice of appeal, followed by an appeal brief. Again, its brief is silent with respect to the requirement for such information. Applicant did not argue against the validity of such a request, or otherwise explain why it had failed to respond to it. At the oral hearing, applicant's attorney merely indicated that perhaps it would have been a better course to have responded.

Trademark Rule 2.61(b) provides that the Examining Attorney may require the applicant to furnish such

12

information and exhibits as may be reasonably necessary to the proper examination of the application.  In response to a request for information such as the Examining Attorney made in this case, an applicant has several options.  It may comply with the request by submitting the required advertising or promotional material.  Or it may explain that it has no such material, but may submit material of its competitors for similar goods or provide information regarding the goods on which it uses or intends to use the mark.  Or it may even dispute the legitimacy of the request, for example, if the goods identified in the application are such ordinary consumer items that a request for information concerning them would be considered unnecessary and burdensome.  What an applicant cannot do, however, is to ignore a request made pursuant to Trademark 2.61(b), as applicant has here.  Accordingly, and because the Examining Attorney's request for information was reasonable, we affirm the refusal based on applicant's failure to comply with the requirement for information concerning its goods.  See **In re Babies Beat, Inc.**, 13 USPQ2d 1729 (TTAB 1990).

Decision:  The refusal based on the unacceptability of the identification of goods is reversed; the refusals based

13

on the ground that the mark is merely descriptive of the services and the requirement for information are affirmed.